UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
PETAR PETROVIC,

                        Plaintiff,

            -against-

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.
-----------------------------------------------------X

**REPORT AND
RECOMMENDATION**

15 Civ. 2194 (KMK)(PED)

TO THE HONORABLE KENNETH KARAS, United States District Judge:

## I.  INTRODUCTION

Plaintiff Petar Petrovic ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g)

challenging the decision of the Commissioner of Social Security (the "Commissioner") denying

his application for benefits on the ground that he was not disabled within the meaning of the

Social Security Act (the "SSA"), 42 U.S.C. §§ 423 *et seq.*  The matter is before me pursuant to

an Order of Reference entered April 1, 2015.  (Dkt. 6.)  Presently before this Court is

defendant's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure.  (Dkt. 10 (defendant's motion), 11 (defendant's memorandum of law in

support).  Although the Commissioner's motion was filed on October 16, 2015, plaintiff did not

respond to the motion in any way.

In recognition of plaintiff's *pro se* status, however, I issued the following order on August 11, 2016:

> On October 16, 2015, Defendant filed a motion for judgment on the pleadings.
>
> To date, no opposition to the motion has been filed.
>
> If Plaintiff intends to submit a response, he must notify the Court, in writing, of his intention within 10 days.
>
> If Plaintiff does not oppose Defendant's motion, this Court will decide the motion based solely on Defendant's submission.

(Dkt. 15.)  To date, plaintiff has not filed any opposition, nor has he contacted my chambers in any fashion.  For the reasons set forth below, I respectfully recommend that defendant's unopposed motion for judgment on the pleadings be **GRANTED.**

## II. BACKGROUND

The following facts are taken from the administrative record ("R.") of the Social Security Administration (Dkt. 13), filed by defendant in conjunction with the Answer.  (Dkt. 12.)

A.    Application History

Plaintiff was born on March 5, 1951 in Yugoslavia.  He came to the United States in 1978 and has university diplomas as a Professor of French language and as a programmer.  He also is a certified supervisor and project manager of asbestos projects.  He worked as a supervisor at an environmental business from August 1999 through May 2011.  (R. 51, 168-50.) Plaintiff applied for temporary disability benefits from the State of New Jersey on May 5, 2011. He was determined ineligible and his claim was denied.  (R. 332.)

Plaintiff applied for Disability Insurance Benefits on January 24, 2012, alleging that he became unable to work because of a disabling condition on May 2, 2011.  (R. 150.)  The

2

Commissioner initially denied Plaintiff's claim, and Plaintiff requested an administrative hearing on June 13, 2012. (R. 83-89.) On April 11, 2013, plaintiff appeared with an attorney before Administrative Law Judge ("ALJ") Michael Rodriguez for a hearing. (R. 37-76.) On September 4, 2013, the ALJ issued a decision finding that plaintiff was not disabled. (R. 22-35.) On January 15, 2015, the Appeals Council denied plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. (R. 5-9.) Plaintiff timely filed this action on March 17, 2016. (Dkt. 2.)

B.    Medical Evidence Prior to Plaintiff's Alleged Onset of Disability of May 2, 2011

The administrative record contains various medical and other treatment records from the time period prior to plaintiff's alleged onset date. The following is a distillation of their relevant points.

1.    Dr. Surie

Plaintiff began seeing chiropractor Dr. John Surie on March 24, 2006, after he sustained injuries in a motor vehicle accident on February 9, 2006. Plaintiff complained of headaches, upper and lower neck pain, right and left sided finger pain, left anterior thigh pain, and severe dizziness. Dr. Surie opined that the conditions were the direct result of the trauma sustained in the car accident. (R. 234-35.) Dr. Surie treated plaintiff's conditions with manual adjustments. Dr. Surie also treated Plaintiff with home icing, moist heat, interferential therapy, trigger point therapy, manual traction, and mechanical traction. Dr. Surie opined that Plaintiff's condition would be adversely affected by his current job duties. (R. 289.) He imposed limitations on Plaintiff to avoid aggravation of his condition, including complete absence from work, no lifting, sports activities, jarring activities, activities which may result in a fall or a blow to the body or head, repetitive motions involving the neck, arms, and hands, vacuuming, mopping, work that

3

requires being on hands and knees, or reaching over the head.  (R. 288-89.)  Plaintiff saw Dr.

Surie regularly through November 2006.  (R. 258-60, 262, 264-66, 270-72, 281-84, 287, 292-94,

296-98.)

On October 10, 2007, Dr. Surie wrote a letter to Plaintiff's attorney regarding his

examination of plaintiff on March 24, 2006.  (234-42.)  Dr. Surie diagnosed plaintiff with

cervicocranial syndrome[1], post-concussion syndrome, variants of migraine without mention of

intractable migraine, cervical vertebra subluxation[2], cervicalgia[3], HNP[4] lumbar, lumbosaral

neuritis/radiculitis, dislocation of the lumbar vertebra, lumbago, muscle spasms, pain in thoracic

spine, and thoracic subluxation.  (R. 240.)  Dr. Surie noted that chiropractic adjustment therapy

was instituted, starting with a frequency of weekly visits and gradually spacing out with longer

intervals between treatments as the symptoms diminished.  Dr. Surie indicated that plaintiff had

continued to show progress and when the maximum benefit of chiropractic care had been

derived, plaintiff was advised that he would require treatment from time to time to obtain relief

from any symptoms that might reoccur or aggravation of the original injury.  (R. 240-41.)

---

[1] "The craniocervical syndrome is an entity whose symptoms: vertigo, cephalea, tinnitus, facial pain, otalgia, dysphagia, pain of the carotid artery are thought to be caused by cervical factors."  US National Library of Medicine, National Institutes of Health, available at http://www.ncbi.nlm.nih.gov/pubmed/4033308.

[2] Subluxation is partial dislocation.  See Merck Manual, available at http://www.merckmanuals.com/professional/musculoskeletal-and-connective-tissue-disorders/neck-and-back-pain/nontraumatic-spinal-subluxation.

[3] Cervicalgia means neck pain.  See MD Guidelines, available at http://www.mdguidelines.com/neck-pain.

[4] "Herniated nucleus pulposus is prolapse of an intervertebral disk through a tear in the surrounding annulus fibrosus."  Merck Manual, available at http://www.merckmanuals.com/professional/neurologic-disorders/peripheral-nervous-system-and-motor-unit-disorders/herniated-nucleus-pulposus.

Dr. Surie opined that plaintiff still suffered from cervical and lumbar pain and radiculopathy as a result of the accident, and that plaintiff had considerable limitation of movement in the cervical and lumbar spine, along with chronic pain, tenderness, and muscle spasm.  Dr. Surie noted that such injuries are subject to exacerbations and tend to be permanent, and that traumatism of this nature characteristically develops into degenerative disc disease, spur formation, neuralgia, and traumatic arthritis.  Dr. Surie opined that plaintiff would continue to suffer and that the permanent injuries created a serious impact on his activities of daily living and physical recreational participation.  Dr. Surie noted that the permanent consequential limitation of use and significant limitation of the spine was further substantiated by the findings of Drs. Meese, Saker, and Bello's reports, summarized below.  Dr. Surie stated that plaintiff had achieved maximum benefit from care and that his prognosis was poor and unstable.  He predicted that plaintiff would continue to suffer from recurrent symptoms due to the damaged musculotendinous and ligamentous supportive elements, and at times of increased physical activity and stress, plaintiff would anticipate future reoccurrence of pain in the spine.  (R. 241-42.)

Plaintiff completed a report on August 6, 2008, in which he indicated that he had been in another motor vehicle accident on July 25, 2008.  He listed Dr. Surie as his treating doctor.  (R. 313-14, repeated in part at 410-11, 444, 462-63.)  Plaintiff resumed treatment with Dr. Surie in August 2008 and continued seeing him through December 2008.  (R. 300-04, 310, 316-25, 327-28, 395-415; repeated in part at 396-407, 438, 439-43, 460, 464.)  Throughout these visits, Dr. Surie noted that plaintiff estimated his overall primary pain to be a 6 on a scale from 1 to 10.  His cervical spine was in a state of moderate muscle spasm., and his cervical spine and upper thoracic regions were notably tender.  Dr. Surie recommended that plaintiff return to his job with

some restrictions imposed.  (Id.)

    2.    Dr. Meese

Plaintiff saw Dr. Michael Meese for a consultation on July 5, 2006.  Plaintiff denied any

numbness, tingling, or paresthesis.  An examination revealed tightness and spasm to palpation

along the cervical musculature, spinosis processes, and thoracolumbar spine.  His range of

motion revealed flexion at 20 degrees and extension to 30 degrees.  Rotation was to the right to

40 degrees and to the left to 60 degrees.  Straight leg raise at 90 degrees revealed very good

flexibility and caused some pain in his lower back, but not down either lower extremity.  His

strength in the hip flexors and extensors, quadriceps, hamstrings, plantar flexion, dorsiflextion,

and EHL[5] were 5/5 and deep tendon reflexes were 2+.  X-rays of the cervical and lumbar spine

did not reveal any fractures or dislocations.  Dr. Meese diagnosed Plaintiff with post-motor

vehicle accident cervical strain and lumbar strain, and advised Plaintiff to continue with

chiropractic care.  Dr. Meese also recommended that plaintiff have an MRI to further evaluate

for nerve root impingement.  (R. 247.)

Plaintiff underwent a magnetic resonance imagine ("MRI") study of the cervical spine on

August 2, 2006, which revealed "disc bulges, left sided C5-6 and C6-7 uncovertebral

hypertrophy results in mild subarticular zone/promial foraminal stenosis" and "no cord

compression."  (R. 245.)  An MRI of plaintiff's lumbar spine that day revealed L4-5 "disc

bulging and superimposed left sided disc herniation, cause left greater than right, subarticular

and foraminal stenosis."  (R. 246.)

---

[5] The extensor hallucis longus is a long thin muscle situated on the shin that extends the
big toe and dorsiflexes and supinates the foot.  Merriam-Webster Dictionary, available at
http://www.merriam-webster.com/medical/extensor%20hallucis%20longus.

3.    Dr. Bello

Plaintiff saw neurologist Dr. Rey Bello for a neurological consultation on September 11,

2006.  Plaintiff complained of headaches, dizziness, and numbness on the right side of his face,

as well as intermittent sharp neck pain aggravated by neck movement, and intermittent sharp and

dull achy pain of the low back with radiation into the legs and left ankle with associated

numbness and tingling.  A neurological examination revealed that plaintiff's mental status was

alert and oriented, with normal higher cognitive functions and speech.  Plaintiff had normal

cranial nerves II-XII, no nystagmus, 5/5 upper extremities and -5/5 left foot dorsiflexion,

decreased pinprick sensation in the right forehead and in the lateral aspect of the left leg, normal

reflexes except absent bilateral biceps reflex, difficulty maintaining left foot dorisflexion when

walking on heels, and an ability to walk on toes without difficulty.  Plaintiff had paracervical,

trapezius, and paralumbar tightness, and positive bilateral straight leg raising test with 30

degrees at left and 60 degrees at right.  Dr. Bello's impression was post traumatic headache,

displacement of cervical invertebral disc without myleopathy, displacement of lumbar

intervertebral disc without myleopathy, and injury to both cervical and lumbar nerve roots.  Dr.

Bello recommended chiropractic treatment at plaintiff's discretion, an EMG/NCV of the lower

extremities to evaluate possible nerve root compression, an MRI of the brain to rule out

intracranial pathology, and ibuprofin.  (R. 255-57.)

The electrodiagnostic results of an October 13, 2006 EMG revealed left L5 radiculopathy

with active denervation.  (R. 248-52.)  Dr. Bello saw plaintiff again on October 16, 2006, and a

neurological examination revealed identical findings as the September 11 studies.  Dr. Bello

diagnosed plaintiff with post traumatic headache and dizziness, cervical disc disease with disc

bulges, disc herniations at L4-L5, and left L5 radiculopathy.  (253-54.)  He recommended that

plaintiff continue chiropractic care and ibuprofin as needed for pain.  He noted that plaintiff may

need interventional pain management if the pain was not resolved after completion of

chiropractic treatment.  He discharged plaintiff and advised plaintiff to follow up with a primary

doctor.  His prognosis was guarded.  (R. 254.)

    4.    <u>Dr. Saker</u>

    Plaintiff saw oral and maxillofacial surgeon Dr. Saker on November 7, 2006 for a follow-

up re-evaluation. Plaintiff complained of paresthesia on the right side of his face pursuant to the

accident, as well as some blurred vision.  Plaintiff told Dr. Saker that he was the driver of a car

where he had to come to a sudden stop, and that a big truck hit him in the back but did not hit his

face.  Dr. Saker's examination revealed some altered sensation on the right side of the

distribution of the infraorbital nerve.  The examination also revealed that plaintiff had

appropriate facial muscle tone, was able to do various facial animation movements, and did not

appear to have any other maxillofacial injuries aside from his neck pain.  Dr. Saker referred

plaintiff to a neurologist for an evaluation to rule out any central lesions that might be affecting

the sensory and motor function for his facial and trigeminal nerves.  (R. 244.)

    5.    <u>Dr. Helojien</u>

    Dr. Barry Helojien examined plaintiff and submitted a report on October 8, 2008 to

Liberty Mutual as a part of plaintiff's claim against his employer, ABS Environmental.  Plaintiff

told Dr. Helojien that he injured his left thumb, right foot, toes, and right pinky finger, but not

his neck or back, in the July 25, 2008 car accident.  Plaintiff reported that he returned to Ultimate

Chiropractic after the accident, where he had previously been treating due to his previous injury.

He stated that he received an MRI of his whole body which showed straightening of his cervical

spine and a fracture in the cervical spine.  He reported that he saw a neurologist who conducted

8

electrodiagnostic studies, which made him worse. Among plaintiff's complaints were dizziness, nausea, and pain in his left ear since his recent accident. He stated that he had not had any surgery in the past and was not taking any medication. (R. 455-57.)

Dr. Helojien's physical examination of plaintiff's neck revealed no deformities. Plaintiff had full range of motion, good motor strength, intact sensation, good grips, and symmetric deep tendon reflexes. A back examination revealed that plaintiff ambulated without a limp, was able to walk on heels and toes, had mild low paralumbar tenderness on either side, no spasm, and soft musculature. He had a full squat, symmetric deep tendon reflexes, and good motor strength in the lower extremities. Plaintiff reported diminished sensation over the left lateral leg through the thigh and calf. Dr. Helojian noted "mild" findings of plaintiff's back and neck. He diagnosed plaintiff with a sprain in the right hand and left thumb. Dr. Helojian opined that plaintiff should continue with his chiropractic care with Dr. Surie, and could continue working. (R. 457-59.)

      6.   <u>Dr. Conte</u>

Plaintiff reported to Dr. Stephen J. Conte that he had pain following a fall on April 15, 2010. Radiographs revealed slight joint effusion of the knee, calcification of the quadriceps, patella tendon insertion, separate ossicle adjacent to the styloid process of the tibia, no evidence of any fracture of dislocation, and calcification of the Achilles tendon insertion. (R. 311.)

C.   <u>Medical Evidence Relating to the Period at Issue: May 2, 2011 to September 4, 2013</u>

The following is a distillation of the relevant points of the various records from after plaintiff's alleged onset date.

      1.   <u>Dr. DeLorenzo</u>

Chiropractor Dylan DeLorenzo completed a medical certificate form for plaintiff on May 20, 2011. He indicated that he had been treating plaintiff once per week since May 2, 2011, the

alleged onset date.  (R. 306,  repeated at R. 412).  Billing records indicate that plaintiff also saw

Dr. Lorenzo twice in 2012, though no diagnosis was recorded.  (R. 447.)

    2.    St. Anthony Community Hospital

Plaintiff was seen by Dr. Richard Manzi at St. Anthony Community Hospital in

Warwick, New York on June 13, 2011.  His authorization form listed no family physician and

indicated that his chief complaint was pain in ribs, chest, and arms.  (R. 383.)  Plaintiff's

physical exam revealed supple neck, symmetrical chest, good respiratory functioning, strong

cardiovascular system, and soft and non-tender abdomen.  Plaintiff was awake and aware,

oriented, and answered questions appropriately.  (R. 387-88.)  Dr. Manzi diagnosed plaintiff with

chronic pain syndrome, chest wall pain, and back pain, and prescribed 12 tablets of Percocet to

be taken every 6 hours as needed, with no refills.  (R. 386, 389-90.)  Plaintiff was discharged

with a pain assessment of 3-4.  (R. 385.)  On June 16, 2011, Plaintiff received multiple tests for

Lyme disease, which revealed mixed results.  (R. 379, 431, 472.)

    3.    Dr. Belasco

Plaintiff saw family practitioner Dr. Nicholas Belasco on June 15, 2011.  Plaintiff

complained of diffuse muscle pain, weakness, cramping in the legs, body pain, numbness, and

vision changes.  Plaintiff told Dr. Belasco that his symptoms started five years prior when he

was hit by a truck in a motor vehicle accident.  After that accident, he had a concussion and

neck, shoulder, and upper back pain.  He could not recall specific details of some of his medical

treatment after that accident.  Plaintiff also informed Dr. Belasco of his second accident two

years prior, which resulted in generalized muscle pain, cramps, and weaknesses.  He said his

symptoms are waxing and waning, and sometimes he has good days where he can do some work

around the house and be more active.  He reported that his symptoms had significantly worsened

in the past two months.  Dr. Belasco's examination revealed an appropriate appearance, normal

conjunctiva and eyelids, normal gait, spine, and tone and muscle in his musculoskeletal system,

and normal judgment and psychiatric insight.  Dr. Belasco had difficulty assessing plaintiff's

extremities because of significant amount of tenderness to palpation diffusely.  Dr. Belasco

noted no focal neurological deficits appreciated.  Dr. Belasco diagnosed Plaintiff with

polymyalgia[6], polyarthropathy[7], polyneuropathy[8], fatigue, herniated cervical disc, intermittent

vision problems, and post-concussive syndrome.

Dr. Belasco opined that plaintiff had serious and significant complaints indicating that

there was "more going on" than simply a car accident.  Dr. Belasco noted that plaintiff would

most likely need neuroimaging at some point, but Dr. Belasco chose not to conduct more

invasive investigations until plaintiff submitted additional records.  (R. 485-86.)

Plaintiff next saw Dr. Belasco on June 22, 2011 for a follow up of blood work.  Plaintiff's chief

complaint was muscle pain, and he also complained of night sweats and difficulty sleeping.

Plaintiff reported to Dr. Belasco that he was taking Naproxen, which gave him night sweats, and

Percocet, which made him dizzy, so he took them as little as possible.  Dr. Belasco diagnosed

plaintiff with Lyme disease.  Dr. Belasco suggested that plaintiff obtain records from prior

---

[6] "Polymyalgia rheumatica is an inflammatory disorder that causes muscle pain and
stiffness, especially in the shoulders." MayoClinic, available at
http://www.mayoclinic.org/diseases-conditions/polymyalgia-rheumatica/basics/definition/con-20
023162.

[7] "Polyarthritis is defined as pain, with or without inflammation, that affects more than
four joints." VeryWell.com, available at
https://www.verywell.com/what-is-polyarthritis-189659.

[8] "Polyneuropathy means several nerves are involved." MedLinePlus, available at
https://medlineplus.gov/ency/article/000777.htm.

11

physicians evaluating the condition, referred plaintiff to an infectious disease doctor for evaluation of the Lyme disease, and recommended antibiotic therapy combined with oral and somatic treatment.  Dr. Belasco noted that this was a complicated case that would need a multi specialty approach.  Dr. Belasco spent 40 minutes with plaintiff, with greater than half of the time spend on counseling regarding the results of Lyme disease, possible therapies, interventions for multisystem dysfunction, and side effects.  He recommended that plaintiff return to the office after an infectious disease evaluation.  (R. 483-84.)

At the request of the Orange County Department of Health, Dr. Belasco completed a form on July 1, 2011 regarding Plaintiff's diagnosis of Lyme disease.  He noted that plaintiff was diagnosed with Lyme disease on June 22, 2011, and that he had fatigue, fevers, and night sweats.  (R. 469.)

    4.    <u>Dr. Helprin</u>

Plaintiff saw psychologist Dr. Leslie Helprin on April 3, 2012.  He reported that he drove himself the ten miles to the evaluation and that he had inflamed nerves, Lyme disease, and a compressed spine.  He told Dr. Helprin that he awakened every hour, had an increased appetite, and had gained 40 pounds.  He reported that he had suicidal thoughts in 2011 but no symptoms of depression, anxiety, mania, or thought disorder.  Dr. Helprin's mental status exam revealed that plaintiff's appearance, gait, posture, motor behavior, and eye contact were all appropriate.  His speech was fluent and clear, he had coherent thought processes, restricted affect, neutral mood, and clear sensorium.  Plaintiff's attention and concentration were intact, his recent and remote memory skills were mildly impaired, and his intellectual skills were in the below average range.  He had good insight and good judgment.  Plaintiff stated that he was able to dress, bathe, and groom himself, cook and prepare foods, clean, launder, and shop.  His wife took over money

management due to his medical problems.  He was able to drive and did not use public

transportation.  He enjoyed socializing with friends, listening to music, and reading, and reported

good family relationships.  (R. 337-40.)

       Dr. Helprin's medical source statement reflected that plaintiff was able to follow and

understand simple directions and instructions, perform rote tasks and complete tasks

independently, maintain attention and concentration, maintain a regular schedule as it pertained

to psychiatric and cognitive outlooks, make appropriate decisions, relate adequately with others,

and deal appropriately with stress.  Dr. Helprin opined that the results of her examination did not

appear to be consistent with any psychiatric problems that would significantly interfere with

plaintiff's ability to function on a daily basis, and she recommended that plaintiff undergo a

medical evaluation to determine if his medical conditions preclude him from all work.  (R. 339.)

      5.    <u>Dr. Rosenfeld</u>

       Dr. Robi Rosenfeld completed an internal medicine examination of plaintiff on April 3,

2012.  Plaintiff informed Dr. Rosenfeld of his two car accidents and stated that though

chiropractic care helped after his 2006 accident, the pain returned after 2008.  Plaintiff said that a

neurologist and ophthalmologist found nothing wrong with him, and that the chiropractic

treatment helped.  Plaintiff said that he takes multivitamins and supplements, but no

medications.  He reported that he did not use tobacco or street drugs, and would drink one or two

alcoholic drinks per month.  Plaintiff complained that he still experienced total body burning,

depending on what he ate.  He became a vegan and when he ate the right foods, the burning went

away.  He reported experiencing burning of the soft tissue muscles and bone joints from the top

of his head to the tip of his toes, and though it did not interfere with his movements, he reported

that he became tired after thirty minutes of activity and experienced vertigo and dizziness

whenever he moved too quickly.  He told Dr. Rosenfeld that he cooked, cleaned, did laundry, shopped, showered, bathed, dressed, listened to the radio, read, and socialized with friends.  (R. 333-36.)

An examination of plaintiff revealed normal general appearance, gait, and station, skin within normal limits, and nothing abnormal of the head and face, eyes, ears, nose, throat, neck, chest, lungs, heart, abdomen, musculoskeletal or neurologic system, extremities, or fine motor activity.  Plaintiff refused x-rays of his spine.  Dr. Rosenfeld diagnosed plaintiff with posttraumatic cervical disk disease, burning sensation all over the body, and vertigo, and gave him a fair prognosis.  She opined that no restrictions were found.  (Id.)

6.   Dr. Herrick

Dr. A. Herrick completed a psychiatric review of plaintiff on April 9, 2012 and concluded that plaintiff had no medically determinable impairment.  (R. 341.)

7.   Occupational and Community Health Services

On May 12, 2012, Plaintiff was evaluated by Occupational and Community Health Services for asbestos work.  His physical examination revealed normal pulmonary function and his exam was overall "within acceptable limits."  His Forced Expiratory Volume  ("FEV-1")[9] test was 77% predicted, and the licensed health care provider interpreted his results to reveal "low vital capacity possibly due to restriction of lung volumes."  Plaintiff was denied clearance to work in asbestos.  (R. 416-17.)

---

[9]  This is how much air you can force from your lungs in one second.  This reading helps your doctor assess the severity of your breathing problems. Lower FEV-1 readings indicate more significant obstruction.  Mayo Clinic, available at http://www.mayoclinic.org/tests-procedures/spirometry/basics/results/prc-20012673.

D.    Non-Medical Evidence

Plaintiff testified that he had physical injuries from two motor vehicle accidents.  (R. 53.)

Plaintiff claimed that he was unable to work due to damage of the left vertebra in the cervical

spine.  (R. 54.)  He stated that his whole head "hurts like hell," and that he felt pain throughout

his entire body.  (R. 55.)  He recalled that he went to a clinic across the street from the hearing

and saw Dr. Bello.  Since medicine did more damage, he refused to take it anymore and engaged

in "what they call self-medicating," or "trying to do correct diet and try to provide my body with

whatever nutrients it might need to rebuilt itself."  (R. 55.)  He stated that some days he was

"just like spinning around," and was unable to sit, sleep, or stand.  (Id.)  He tried to keep busy

around the house by doing handyman chores such as installing a door.  However, sometimes if

he "ben[t] a certain way" he was "done for two, three, four days."  (R. 56.)  He testified that he

"dr[a]nk certain liquids, stuff like that, to bring balance - - basically . . . extinguish fire inside of

the body."  (R. 56.)  He explained that he felt fire around his triceps to his hands, and that "it's

like metal sometimes."  (Id.)  He testified that he spent his time "sitting around and rotting

away" on his porch outside.  (R. 57.)

Plaintiff testified that his primary doctor was his chiropractor.  He used to see Dr. Surie,

but had been seeing another chiropractor at the office since Dr. Surie moved.  (R. 58.)  He

testified that he went to St. Anthony Hospital between three and five times for "anti-

inflammatory garbage and antibiotics."  (R. 58.)  Plaintiff testified that he did not like taking

medicine because it was "killing [him]," and was "no good."  He testified that he was diagnosed

with Lyme disease by Dr. Bello.  (R. 58-59.)

Plaintiff testified that he had not been able to participate in physical activities because of

the pain in his body, dizziness, nausea, and burning.  (R. 61-62.)  Plaintiff stated that a Lyme

disease clinic suggested that he be treated with heavy antibiotics, which he refused.  He classified his condition as "nervous system inflammation."  (R. 64, 66.)  He said that he was "not fully functioning" but was "a functioning person."  He testified that he had "a clear mind," was "not a zombie," "not blown with some poisons in [his] body," and that he was "doing excellent." (R. 68-69.)  He testified that his memory had worsened and that he cannot retain information, such as remembering a recent book or recalling information for new customers at work.  (R. 70.) Plaintiff testified that he drove to he hearing, that he recently drove to a party an hour and 20 minutes away, and often drove with his wife to the grocery store.

Plaintiff wrote a letter to the ALJ on April 12, 2013, the day after the hearing.  The letter stated: "I did appear before you, yesterday [t]o prove , I would guess, that; I am dysfunctional, unable to do anything?!?!  Well in my head, in real reality, this is not the case!  I came down to tell you that: right now I am unable to function fully, or correctly?!  I did recuperate a lot!  . . . I am not a liar! . . . Today; people are pushing me to behave like them!?  To lie! To pretend!  To go to corrupt doctors!  To, let's say, come to Goshen's hearing, surrounded by family members, and whomever, to show you how bad I am?! . . . I am asking money for a very simple reason.  I am entitled to it! . . . Right now, today, I am unable to earn money  . . . And to collect, what is rightfully mine, I do not want to submit to torture, poisoning and enable further this evil system, where doctors exist for personal profit at patient suffering.  I lived all my life without 'doctor' and; I am looking forward to a day: to live without doctor, once again."  (R. 221.)

### III.  LEGAL STANDARDS

A.      Standard of Review

1.      Judgment On the Pleadings

A Rule 12(c) motion for judgment on the pleadings is evaluated under the same standard

16

as a Rule 12(b)(6) motion to dismiss.  Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010).  Thus, "[t]o survive a Rule 12(c) motion [for judgment on the pleadings], the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Id. (internal quotation marks and citation omitted).  A pro se litigant's pleadings and submissions must be construed liberally and interpreted "to raise the strongest arguments that they suggest."  Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006).

In the context of a Social Security benefits appeal, if a motion for judgment on the pleadings is unopposed, the Court may not grant the unopposed motion based merely upon the opposing party's failure to respond; rather, the Court "must review the record and determine whether the moving party has established that the undisputed facts entitle it to judgment as a matter of law."  Martell v. Astrue, No. 09 Civ. 1701, 2010 WL 4159383, at *2 n.4 (S.D.N.Y. Oct. 20, 2010) ("[I]n light of the similarity between a motion for summary judgment and a motion on the pleadings in the present context, where there is a fulsome record of the underlying administrative decision, we look to the summary judgment context for guidance.").  See also McCreery v. Commissioner of Soc. Sec., No. 13 Civ. 3254, 2014 WL 3377099, at *4 (S.D.N.Y. July 9, 2014); Sepulveda v. Commissioner of Soc. Sec., No. 12 Civ. 4301, 2013 WL 6588452 (S.D.N.Y. Dec. 16, 2013).[10]

2.    Review of the ALJ's Decision

In reviewing a decision of the Commissioner, a district court may "enter, upon the

_____

[10] Copies of all unpublished opinions and decisions available only in electronic form cited herein have been mailed to plaintiff.  See Lebron v. Sanders, 557 F.3d 76, 78 (2d Cir. 2009).

pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999).  Rather, the court's review is limited to "'determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard.'" Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009) (quoting Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002)).

The substantial evidence standard is "even more" deferential than the "'clearly erroneous' standard." Brault v. Social Sec. Admin, 683 F.3d 443, 448 (2d Cir. 2012).  The reviewing court must defer to the Commissioner's factual findings, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence. See 42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).  Substantial evidence is "'more than a mere scintilla'" and "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Lamay v. Commissioner of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted).  "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted.  Pratts

18

v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

B.    Statutory Disability

      A claimant is disabled under the SSA when he or she lacks the ability "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  In

addition, a person is eligible for disability benefits under the SSA only if

> his physical or mental impairment or impairments are of such severity that he is
> not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work.

Id. § 423(d)(2)(A).

      A claimant's eligibility for SSA disability benefits is evaluated pursuant to a five-step

sequential analysis:

1.    The Commissioner considers whether the claimant is currently engaged in
substantial gainful activity.

2.    If not, the Commissioner considers whether the claimant has a "severe
impairment" which limits his or her mental or physical ability to do basic
work activities.

3.    If the claimant has a "severe impairment," the Commissioner must ask
whether, based solely on medical evidence, claimant has an impairment
listed in Appendix 1 of the regulations.  If the claimant has one of these
enumerated impairments, the Commissioner will automatically consider
him disabled, without considering vocational factors such as age,
education, and work experience.

4.    If the impairment is not "listed" in the regulations, the Commissioner then
asks whether, despite the claimant's severe impairment, he or she has
residual functional capacity to perform his or her past work.

5.     If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

Rolon v. Commissioner of Soc. Sec., No. 12 Civ. 4808, 2014 WL 241305, at *6 (S.D.N.Y. Jan. 22, 2014); see 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).  The claimant bears the burden of proof as to the first four steps of the process.  See Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003).  If the claimant proves that his impairment prevents him from performing his past work, the burden shifts to the Commissioner at the fifth and final step.  See id.; 20 C.F.R. § 404.1560(c)(2).  At the fifth step, the Commissioner must prove that the claimant is capable of obtaining substantial gainful employment in the national economy.  See Butts v. Barnhart, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

## IV.  THE ALJ'S DECISION

The ALJ properly applied the five-step sequential analysis described above and concluded that plaintiff was not disabled under the meaning of the SSA.  (R. 25-31.)  At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since May 2, 2011, the alleged onset date.  (R. 27.)  At step two, the ALJ concluded that plaintiff's lumbar and cervical degenerative disc disease, degenerative joint disease, and chronic pain syndrome constituted "severe impairments" within the meaning of the SSA.  (R. 27.)  At step three, the ALJ determined that plaintiff's impairments (individually or combined) did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 27.)

The ALJ determined that plaintiff had the residual functional capacity to perform the full range of medium work as defined in 20 CFR 404.1567(c).  (R. 28.)  At step four, the ALJ found that plaintiff could no longer perform his past relevant work.  (R. 30.)

20

At step five, the ALJ determined that transferability of job skills is not material to the

determination of disability because using the Medical-Vocational Rules as a framework supports

a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job

skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)," and that "[c]onsidering

the claimant's age, education, work experience, and residual functional capacity, there are jobs

that exist in significant numbers in the national economy that the claimant also can perform (20

CFR 404.1569 and 404.1569(a))." (R. 30.) The ALJ concluded that plaintiff had not been

"disabled" under the SSA. (R. 31.)

## V. ASSESSING THE ALJ'S FINDINGS

I have liberally construed plaintiff's *pro se* submission and, in light of the record

evidence, interpreted it to raise the strongest arguments it suggests. <u>Triestman</u>, 470 F.3d at 474.

Accordingly, I read plaintiff's complaint to challenge (1) the legal standards the ALJ applied and

(2) the sufficiency of the evidence supporting his decision.

A.    <u>Legal Standards</u>

In denying plaintiff's application for disability benefits, the ALJ properly followed the

regulatory five-step procedure, and therefore plaintiff could not challenge the ALJ's decision on

that basis. Furthermore, the ALJ properly applied the legal standards as explained below.

1.    <u>Duty to Develop the Record</u>

The ALJ fulfilled his duty to develop the record. Plaintiff listed his severe impairments

as degenerative changes of the cervical and lumbar spine, lumbar radiculopathy, and chronic

pain syndrome. (R. 218.) He listed Occupational and Community Health and Dr. John Surie as

sources who may have medical records or other information about his illnesses, injuries, or

conditions since he last completed a disability report. (R. 201-02.) On February 29, 2012,

plaintiff reiterated that he had no primary care physician and his only doctor was a chiropractor. (R. 177.)

      a.      <u>Ultima Chiropractic Center</u>

The New York State Office of Temporary and Disability Assistance Division of Disability Determinations initially requested records from Dr. Surie on February 28, 2012 and sent follow-up letters on March 13 and April 6, 2012.  Ultima Chiropractic Center submitted some records for plaintiff on April 23, 2012 (R. 228-29, 355, 364-69) as well as billing statements.  (R. 437-54.)  On July 12, 2012, the Social Security Administration sent a follow up request for additional medical records.  (R. 213, <u>repeated</u> at 366.)  However, no additional records were provided.  Under 20 C.F.R. § 404.1512, the Social Security Administration has the duty to "make an initial request for evidence from [plaintiff's] medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received . . . make one followup request to obtain the medical evidence necessary to make a determination."

Here, the ALJ made a total of four requests to Ultima Chiropractic Center for plaintiff's records.  Furthermore, "an ALJ's obligation to develop the record only applies, however, where 'the records received [are] inadequate . . .  to determine whether the [claimant is] disabled. Thus, an ALJ is not required to attempt to obtain additional evidence to fill *any* gap in the medical evidence; rather an ALJ is required to do so only where the facts of the particular case suggest that further development is necessary to evaluate the claimant's condition fairly." <u>Francisco v. Comm'r of Soc. Sec.</u>, No. 13 CV 1486 (TPG) (DF), 2015 WL 5316353, at *11 (S.D.N.Y. Sept. 11, 2015) (emphasis in original) (internal citations omitted).  Here, the ALJ's multiple efforts to obtain records from Drs. Surie and DeLorenzo went beyond the ALJ's duty to develop the record, especially in light of Dr. Surie being a chiropractor whose opinion would not

be necessary to determine plaintiff's disability under the regulations, as described below.

      b.  <u>St. Anthony Community Hospital</u>

      Though the only records that the ALJ obtained from St. Anthony Community Hospital are from June 13, 2011 (R. 379-92), plaintiff testified that he "went to St. Anthony Hospital three, four, maybe five times . . . to bring . . . pain down." (R. 58.) Plaintiff authorized the disclosure of his information from St. Anthony to the SSA on June 8, 2012. (R. 374.) On July 12, 2012, the agency requested all medical records since May 1, 2010 from St. Anthony regarding plaintiff. (R. 205, <u>repeated</u> at 371.) A Disability Worksheet notes that St. Anthony did not respond to the agency's request. (R. 355.) The ALJ was fairly able to evaluate plaintiff's condition without reviewing any additional records from St. Anthony beyond those of June 13, 2011, to the extent any such records exist. Therefore, the ALJ satisfied his duty to develop the record as to St. Anthony Community Hospital.

      c.   <u>Dr. Belasco</u>

      Plaintiff informed the ALJ at the hearing that someone at St. Anthony's Hospital "suggested [he] call another clinic . . . in Goshen, [a] specialist to treat Lyme Disease." (R. 59.) Plaintiff said that he thought the doctor's name was "Dr. Bello," and did not mention Dr. Belasco, the doctor in Goshen who counseled plaintiff regarding his Lyme disease. (<u>Id.</u>, 483-86.)

      Though plaintiff did not list Lyme Disease as an impairment, the ALJ encouraged plaintiff to submit records regarding his Lyme disease. He advised plaintiff that "What ever [sic] [the doctor] says about Lyme Disease that's something I can look at also. It doesn't just have to be the nerve condition you're talking about. I look at all of the medical information that relates to you and how it affects your ability to do work functions, and Lyme Disease could

affect you that way, if it's there."  The ALJ told plaintiff, "if you choose not to submit those

records, that's up to you," and gave plaintiff an additional 30 days to submit the records.  (R.

60.)

Plaintiff has the responsibility for "furnish[ing] . . . medical and other evidence of the

existence" of a disability.  42 U.S.C. § 423.(d)(5)(A).  <u>See</u> 20 CFR §§ 404.1512(a); 404.1512(c).

An ALJ has the duty to make "every reasonable effort to help [a plaintiff] get medical reports

from [a plaintiff's] own medical sources," but only when a plaintiff "give[s] [the ALJ]

permission to request the reports."  20 C.F.R. § 404.1512.  Here, plaintiff neither gave the ALJ

permission to request Dr. Belasco's report nor informed the ALJ of Dr. Belasco by name.  The

ALJ satisfied his duty to develop the record by offering to keep the record open for thirty days

following the hearing, and keeping the record open for nearly five months before issuing his

decision.  (R. 75, 22-35).  <u>Martinez-Paulino v. Astrue</u>, No. 11 Civ. 5485 (RPP), 2012 WL

3564140, at *14 (S.D.N.Y. Aug. 20, 2012) ("[T]he ALJ fully satisfied his duty to develop the

record by leaving the record open for an ample amount of time for Plaintiff to submit treatment

records" where the ALJ "offered to keep the record open for an additional two weeks following

the hearing to allow Plaintiff an opportunity to obtain the treatment records," and "the record

remained open for five weeks after the hearing before the ALJ issued his decision."); <u>Rivera v.

Comm'r of Soc. Sec.</u>, 728 F. Supp. 2d 297, 330 (S.D.N.Y. 2010) ("Courts do not necessarily

require ALJs to develop the record by obtaining additional evidence themselves, but often permit

them to seek it through the claimant or his counsel. . . . Accordingly, the ALJ's request that

plaintiff's attorney obtain the recent treatment records . . . fulfilled his obligations with regard to

developing the record.").

24

2.      Treating Physician Rule

The ALJ did not violate the Treating Physician Rule.  Generally, in considering any medical opinions set forth in the administrative record, the ALJ must give controlling weight to the opinion of a treating physician if it is well-supported by the medical record and is not inconsistent with other substantial record evidence.  See Green-Younger, 335 F.3d at 106; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  A "treating source" is a claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502.

In this case, the only doctors who treated plaintiff on an ongoing basis appear to have been Drs. Surie and DeLorenzo of Ultima Chiropractic.  "Under the pertinent regulations, chiropractors are not listed as '[a]cceptable medical sources' for purposes of the treating-physician rule."  O'Connor v. Chater, 164 F.3d 618 (2d Cir. 1998) (citing 20 C.F.R. § 404.1513(a); id. § 404.1513(e)(3) ("chiropractors" are "[o]ther sources").)  Because Drs. Surie and DeLorenzo of Ultima Chiropractic are not acceptable medical sources for the purpose of establishing disability under the regulations, the ALJ properly declined to grant their opinions controlling weight.

3.      Vocational Analysis

The ALJ's analysis at step five was proper.  The ALJ determined that, under 20 CFR § 404.1565, plaintiff was unable to perform his past relevant work as an environmental inspector/supervisor which required him to stand, walk, and sit one to eight hours per day, lift 100 or more pounds, and frequently lift twenty-five to fifty pounds or more.  (R. 51, 168-50.)  The ALJ assessed that jobs exist in significant numbers in the national economy that plaintiff can

25

perform considering plaintiff's age, education, work experience, and RFC for the full range of medium work. The ALJ correctly determined that, considering plaintiff was 60 years old as of the alleged onset date, had at least a high school education, and was able to communicate in English, plaintiff was not disabled under Rule 203.07 of the Medical-Vocational Guidelines at 20 C.F.R. Part 404, Subpart P, Appendix 2. 20 C.F.R. § 404.159; see Heckler v. Campbell, 461 U.S. 458, 467 (1983) (reliance on medical-vocational guidelines is not inconsistent with the Social Security Act).

B.      Sufficiency of the Evidence

        The ALJ's decision is supported by the medical evidence of record, as set forth below.

        1.      Plaintiff's Credibility

        "When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (internal citations omitted). In deciding how much weight to give to a claimant's subjective complaints, the ALJ must follow a two-step process set forth in the Social Security regulations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. Id. The ALJ must consider statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the

26

> agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.  20 C.F.R. § 404.1512(b)(3); <u>see</u> <u>also</u> 20 C.F.R. § 404.1529(a); S.S.R. 96–7p.

<u>Genier</u>, 606 F.3d at 49 (internal quotation marks and brackets omitted).  "[W]here the ALJ finds that the medical evidence does not substantiate the claimant's allegations [of pain and other limitations], the ALJ must assess the claimant's credibility by considering seven factors enumerated in the Social Security regulations."  <u>Rivera v. Astrue</u>, No. 10 CV 4324, 2012 WL 3614323, at *14 (E.D.N.Y. Aug. 21, 2012).  These factors are:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.

<u>Meadors v. Astrue</u>, 370 F.App'x 179, 184 n.1 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c) (3)(i)-(vii)).

"Under the substantial evidence standard, a credibility finding made by an ALJ is entitled to deference by a reviewing court."  <u>Acevedo v. Astrue</u>, No. 11 Civ. 8853, 2012 WL 4377323, at *11 (S.D.N.Y. Sept. 4, 2012) (Report & Recommendation), <u>adopted by</u> 2012 WL 4376296 (S.D.N.Y. Sept. 24, 2012).  Nevertheless, "[a]n ALJ who finds that a claimant is not credible must do so 'explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence.'"  <u>Rivera</u>, 2012 WL 3614323, at *14 (quoting <u>Taub v. Astrue</u>, No. 10 Civ. 2526, 2011 WL 6951228, at *8 (E.D.N.Y. Dec. 30, 2011)).

Here, the ALJ correctly applied the two-step process described above to assess plaintiff's subjective complaints of pain and associated functional limitations.  (R. 10-11.)  The ALJ found,

"[a]fter careful consideration of the evidence," that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. 28.) Though the ALJ found Plaintiff's statements to not be "entirely" credible, the ALJ indicated that "in making a determination in this case, I also give some weight to the claimant's subjective complaints." (R. 29.) The ALJ explained that his RFC assessment "gives the benefit of the doubt to [plaintiff's] subjective complaints of pain," and noted that the RFC is supported by "the claimant's own testimony regarding his full activities of daily living."

The ALJ considered plaintiff's subjective complaints as reported to the consultative and examining physicians, and considered the factors enumerated in the Social Security regulations. With regard to plaintiff's daily activities, the ALJ noted that plaintiff told Drs. Rosenfeld and Helprin that he cooks, cleans, launders, and shops, is independent in all personal hygiene activities, and likes to listen to the radio, read, and socialize with friends. (R. 29-30.) The ALJ recognized that "chiropractic treatments . . . seem to alleviate his symptoms" and that "he controls the burning sensation symptoms [with a] vegan diet." (R. 29.) The ALJ noted that Plaintiff "does not take any medications at this time," and "refused to undergo x-ray studies of the spine." (Id.) The ALJ appropriately considered these facts in finding plaintiff's subjective complaints "not entirely credible," and did not appear to have overlooked any other factors prescribed by the regulations in evaluating plaintiff's credibility.

In sum, the ALJ considered plaintiff's subjective complaints, and sufficiently explained his credibility determination. Plaintiff's own statements regarding his functioning support the ALJ's decision that plaintiff was not disabled.

28

2.     Medical Evidence Reviewed by the ALJ

In determining that plaintiff had the RFC to perform the full range of medium work as defined in 20 CFR 404.1567(c), the ALJ undertook a thorough review of the record in accordance with the governing regulations.  (R. 28-30.)

The ALJ discussed the record evidence of Dr. Surie, which does not encompass the relevant time period, and the results of plaintiff's MRIs.  (R. 28-29.)  The ALJ noted that in 2008, Dr. Surie recommended that plaintiff return to his past work with unspecified limitations. As explained above, the ALJ was not required to give controlling weight to Dr. Surie's opinion, even if the opinion related to the time period at issue.  Consequently, Dr. Surie's recommendation that plaintiff adhere to unspecified limitations does not call the ALJ's RFC determination into question.  Next, the ALJ considered the neurological examination of Dr. Bello, whose recommendations of chiropractic treatment and ibuprofin are not incompatible with plaintiff's ability to perform the full range of medium work.  (R. 29.)

The ALJ gave great weight to the opinion of the consultative examiner Robi Rosenfeld, who evaluated plaintiff on April 3, 2012 and determined that plaintiff had no restrictions.  The ALJ reviewed plaintiff's complaints to Dr. Rosenfeld and the results of the doctor's examination, and concluded that Dr. Rosenfeld's opinion was well supported by objective medical findings and consistent with plaintiff's conservative treatment history as well as his testimony regarding his daily functioning.  (R. 29, 335.)

The ALJ reviewed Plaintiff's visit to St. Anthony's Community Hospital, where plaintiff requested to refill his pain management narcotic medication.  The ALJ noted that no treatment was performed or recommended, and that plaintiff was released in stable condition.  (R. 29.)

The ALJ also considered the evaluation of the consultative psychologist Dr. Helprin, who

opined that plaintiff was able to follow and understand simple instructions and directions,

perform simple routine and complex tasks independently, maintain attention and concentration,

maintain a regular schedule, make appropriate work-related decisions, relate adequately with

others, and deal appropriately with stress.  Dr. Helprin's conclusion that "the results of the

examination do not appear to be consistent with any psychiatric problems that would interfere

with the claimant's availability to function on a daily basis" provides further support for the

ALJ's decision.  (R. 339.)  Overall, the medical evidence that the ALJ reviewed provide

substantial evidence to support his decision.

     3.     <u>Evidence Submitted On Appeal</u>

     Plaintiff's counsel Eric Shore submitted new evidence along with his appellate brief on

December 4, 2013, three months after the ALJ issued his decision.   (R. 223-27, 455-86).  The

Appeals Council stated that it considered the records from Occupational Medical Associates and

Dr. Belasco in accordance with 20 C.F.R. § 404.970(b) ("If new and material evidence is

submitted, the Appeals Council shall consider the additional evidence only where it relates to the

period on or before the date of the administrative law judge hearing decision.").  (R. 5-6, 9-10.)

The Appeals Council concluded that the weight of evidence of record, including the additional

evidence submitted, did not provide a basis for changing the ALJ's decision.  (R. 5-6.)

     "When the Appeals Council denies review after considering new evidence, [the court]

simply review[s] the entire administrative record, which includes the new evidence, and

determine[s], as in every case, whether there is substantial evidence to support the decision of

the Secretary."  <u>Perez v. Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996).  I do not find that the new

evidence submitted by counsel on appeal undermines the ALJ's decision, as set forth below.

a.    Dr. Belasco

In June 2011, Dr. Belasco diagnosed plaintiff with Lyme disease, polymyalgia, polyarthropathy, polyneuropathy, fatigue, herniated cervical disc, intermittent vision problems, and post-concussive syndrome.  Plaintiff's subjective complaints gave Dr. Belasco "concern that there is more going on . . . than simply a car accident," and Dr. Belasco suggested further neuroimaging, a "multi-specialty approach," and an evaluation of plaintiff's other medical records.  However, Dr. Belasco did not indicate that Plaintiff had any functional limitations, and Dr. Belasco's own physical examination of plaintiff was largely unremarkable.  Therefore, the records of Dr. Belasco's two evaluations of plaintiff do not contradict the ALJ's decision.

b.    Occupational Medicine Associated Records

On October 8, 2008, Dr. Helojian diagnosed plaintiff with a sprain in the right hand and left thumb and opined that plaintiff should continue with his chiropractic care with Dr. Surie and can continue working.  (R. 458-59.)  Dr. Helojian's examination took place before the relevant time period and did not note any functional limitations, and therefore does not weigh against the ALJ's findings.

## VI.  CONCLUSION

For the reasons set forth above, I respectfully recommend that defendant's motion for judgment on the pleadings be **GRANTED**.

Dated: August 25, 2016
       White Plains, New York

                       Respectfully submitted,

                       Paul E. Davison, U.S.M.J.

### NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to serve and file written objections. <u>See also</u> Fed. R. Civ. P. 6(a).  Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Kenneth Karas, at the Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Karas.

32

A copy of this Report and Recommendation has been mailed to:

Petar Petrovic
376 Liberty Corners
Pine Island, NY 10969